# Richmond

## MINNIE E. KNIGHT v. THE PEOPLES NATIONAL BANK OF LYNCHBURG, ET ALS.

March 13, 1944.

Record No. 2751.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Perrow & Rosenberger*, for the plaintiff in error.

*Caskie, Frost & Watts* and *S. G. Hamner*, for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

The city of Lynchburg, in an action brought against it by the Peoples National Bank of Lynchburg, assignee of B. E. Hughes, acknowledged that it was indebted to B. E. Hughes in the sum of $1833.36, disclaimed any interest in the fund and prayed that Minnie E. Knight, execution cred-

itor of B. E. Hughes, be made a party to the action and that the question of priority be litigated between the assignee and the execution creditor. From a judgment ordering the sum owed by the city to be paid to the assignee bank, Minnie E. Knight, the execution creditor, obtained this writ of error.

The Corporation Court of the city of Lynchburg, on August 21, 1941, appointed B. E. Hughes and S. G. Hamner to assess the value of all real estate and improvements thereon within the city. On September 22, 1941, the two appointees appeared before the city council and asked the city to fix the amount of their compensation for services as assessors. Pursuant to this request, the council set aside the sum of $8,500—$3,000 for expenses to be incurred and $5,500 as compensation for the two assessors to be divided between them. On November 27, 1941, B. E. Hughes executed an assignment of his "salary as assessor of real estate for the year 1942 amounting to $2,750.00 payable in monthly installments beginning February 1st, 1942," to Dorothy Hughes to be applied "on account of my indebtedness to her." Two days later Dorothy Hughes assigned her right in the assignment to the Peoples National Bank of Lynchburg and directed that the monthly installments be applied on the payment of a note she owed the bank. The city, on receipt of notice of the assignment, paid the assignee $916.64, four months' compensation due B. E. Hughes. On May 6, 1942, Minnie E. Knight caused an execution to be issued on a judgment for $2,250, which she had recovered against B. E. Hughes in 1938. The city, when notified of this execution, declined to make any further payments either to the assignee or to the execution creditor of B. E. Hughes.

Minnie E. Knight contends that the assignment of B. E. Hughes to Dorothy Hughes is invalid and void for the following reasons: (1) It was a voluntary conveyance without valuable consideration and in fraud of creditors of the assignor; (2) the property involved was the salary or wages due a city employee, and the assignment was not in

the form prescribed by chapter 432 of the Acts of 1940 (Michie's 1942 Code, sec. 6555a); and (3) the assignment of the unearned wages or salary of a city employee is against the public policy of the Commonwealth.

The only witnesses who testified on the question, whether the assignment was based on valuable consideration, were B. E. and Dorothy Hughes, father and daughter. Their testimony is not contradicted and may be summarized as follows: Dorothy Hughes obtained, by the will of her grandfather and by an assignment of two brothers, property valued at $30,000. A part of this property consisted of stock in various corporations. In 1936, on the request of her father, Dorothy Hughes lent a part of this stock, valued in 1939 at $4,500, to her father to be used as collateral on his note held by the Peoples National Bank of Lynchburg. Father and daughter understood or agreed, at the time, that the debt would be paid by the father and the stock returned to the daughter, but, if the collateral had to be sold to pay the debt owed by the father, he would repay his daughter the value of the stock.

Hughes was unable to pay the bank when his note was called in 1939. Thereupon an agreement was made between B. E. Hughes, the bank and Dorothy Hughes, whereby Dorothy Hughes agreed to pay the bank $6,800—$4,500 of which was the value of the stock that she had lent her father, and $2,300 of which was the value of other stock owned by the father, which he sold with the bank's consent to his daughter. While it appears that B. E. Hughes owed large sums to other creditors, he did owe his daughter at least $4,500 which was ascertained to be the value of stock that the daughter had lent her father three years previously.

██ The assignment creates a preference between creditors of the assignor. There is no State law that prohibits a debtor from preferring one creditor over another. The stock lent the father was in the name of the daughter and remained in her name while held as collateral by the bank, but, before the daughter could obtain possession of the stock, she had to pay, or secure to the bank the payment of,

its then market value, which she did. Such being the uncontradicted evidence, it follows that the assignment was based upon valuable consideration.

The first paragraph of Michie's 1942 Code, sec. 6555a (Acts of 1940, p. 899), provides: "No assignment, transfer, pledge, or hypothecation of wages or salary due or to become due to any person shall be valid and enforceable against any employer of the assignor, except with the express consent in writing to creditor or assignee of such employer (employee), unless and until all of the following requirements have been fully met."

The assignments do not conform to the provisions of this act. The city did not express its consent in writing to the creditor of B. E. Hughes or Dorothy Hughes.

The assignment of wages has been regulated and restricted in many states. The constitutionality of this class of legislation has been sustained on the theory that wage earners are peculiarly susceptible to wrongs and impositions, and therefore the prevention of such wrongs and impositions is a proper subject for the legislative exercise of police power. See *Wight* v. *Baltimore, etc., R. Co.*, 146 Md. 66, 125 A. 881, 37 A. L. R. 864; *Morris* v. *Holshouser*, 220 N. C. 293, 17 S. E. (2d) 115, 137 A. L. R. 733; 4 Am. Jur. 262.

The scope and application of the various acts in different jurisdictions depend upon the specific language of the respective acts. The purpose, however, seems to be two-fold: (1) to protect the wage earner from imposition, and (2) to protect the employer from undue annoyance by creditors or assignees of the employee.

While the language of the Virginia act is general, its application is limited to "wages or salary due or to become due" to a person by "any employer." Any employer may avoid the requirements of the act by written consent to the assignee. The application of the statute is optional with the employer. It follows that the dominant purpose of the act is the protection of the interest of the employer rather than the protection of the interest of the employee.

Even if the city be regarded as an employer within the terms of this act, it has no interest to protect in this litigation. By paying the assignee one-third of the total compensation, it has acknowledged the validity of the assignment. It does not object to the payment of the other two-thirds of the fund to the assignee. It simply asks the court to determine which one of the two contesting creditors of the assignor is entitled to receive payment.

The object of the statute of limitations is to protect the debtor from the enforcement of stale demands. It is a personal privilege of the debtor and it is optional with him whether he elects to use it as a means of defense to the action. The statute regulating assignments provides that "no assignment shall be valid and enforceable against any employer" unless certain conditions are fulfilled. The city did not elect to use this statute as a defense. The wording of the statute clearly indicates that it was not contemplated by the legislature that it should be used as a weapon by another creditor of the assignor to fight his way to a more favorable position in line of payment.

The facts in *Hawes* v. *Trigg*, 110 Va. 165, 65 S. E. 538, were that W. R. Trigg Company contracted with the United States Government to construct two revenue cutters. Before the construction was completed, the Trigg Company assigned certain payments to become due under the contract to the First National Bank of Richmond to secure the payment of money borrowed from the bank. Later, liens for labor and supplies used in construction were perfected. In a controversy in the State court between the creditors of the Trigg Company, the Government paid the total amount due into court and asked the court to make the proper distribution among the respective claimants. The lien creditors attacked the validity of the assignment to the bank on the ground that the assignment was void because it did not comply with the formalities required by section 3477 of the revised statutes of the United States. This statute declared all transfers and assignments of claims due by the Government to be void unless certain formalities were complied

with. It was conceded that the assignment was not in accordance with the statute. This court, speaking through Judge Keith, held that section 3477 of the United States revised statutes was adopted for the benefit of the Government and, since the Government had not seen fit to claim its benefit, other creditors of the assignor could not avail themselves of the provision. See *Taylor* v. *Dollins*, 205 Mo. App. 246, 222 S. W. 1040; *Fortunato* v. *Patten*, 147 N. Y. 277, 41 N. E. 572; *York* v. *Conde*, 147 N. Y. 486, 42 N. E. 193; *Hopfan* v. *Knauth*, 156 Misc. 545, 282 N. Y. S. 219; *Hitchings* v. *Central Electrical Supply Co.*, 182 App. Div. 28, 169 N. Y. S. 611; *Delaware County Com'rs* v. *Diebold Safe, etc., Co.*, 133 U. S. 473, 10 S. Ct. 399, 33 L. Ed. 674; *Burck* v. *Taylor*, 152 U. S. 634, 14 S. Ct. 696, 38 L. Ed. 578.

The provisions of the act of 1940, p. 899, are confined to wages or salary due or to become due. The relation existing between a municipality and a tax assessor is not that of an employer and an employee. It more nearly resembles the relation existing between a principal and an independent contractor. The municipality has no voice in the selection of an assessor. He is appointed by the corporation court. The municipality has no power or authority to discharge or remove an assessor. That power is expressly lodged in the corporation court. The municipality has no control or supervision over the assessor or his work. It has no authority to prescribe the time or the manner in which his duties are to be performed. The municipality's power and authority over an assessor are limited to the right to determine, and pay, the amount of his compensation.

In *Griffith* v. *Electrolux Corp.*, 176 Va. 378, 11 S. E. (2d) 644, we held that the relation of principal and independent contractor was created when a person employed another to obtain specific results, but had no control or right of control over the details of his movements, or the time or manner of performing the work. In that case it was stated that the controlling or principal test is whether or not the employer, using that term in a broad sense, has the right to control the details of the work to be done, or

whether the employee represents the employer only as to results to be accomplished. In this case, even if the assessor's work is not satisfactory, the municipality has no power to reject it. In the final analysis, the corporation court, and not the city, determines whether the work is performed satisfactorily.

The relation of employer and employee does not exist where the former has no right to select the latter, no right of control, no right to discharge or remove, no power or authority to prescribe the duties, and no right to determine the method, the manner or the time in which the services shall be performed.

The early English and the majority of the American cases hold that an assignment of emoluments of a public office thereafter to accrue is void, whether such emoluments consist of salary, fees or other profits.

This court said, in *Blair* v. *Marye*, 80 Va. 485, 495: "The public service is protected by protecting those engaged in performing public duties; and this, not on the ground of private interest, but upon the necessity of securing efficiency in the public service, by seeing to it that the compensation provided for its performance, shall be received by those who are to perform the work; but the *withholding* the salaries and emoluments of constitutional public officers, would prove hurtful and even disastrous to the public service."

In the same case, at page 497, it is said: "The services and salary of a public officer are founded in constitutional grant, and not in *contract;* and they have none of the affinities or liabilities under the law of contract. The salary of the attorney-general is of constitutional grant and of public official right; and the doctrine of *offset* cannot be applied to it, as the auditor asserts a right to do in this case. It is not liable to *attachment*, nor to be *garnisheed;* nor to assignment in bankruptcy, and, upon principles of *public policy*, it has absolute immunity from detention for debt or counterclaim."

This was undoubtedly the public policy of this State at the time that opinion was rendered. It continued to be the

public policy until 1898, when the General Assembly expressly declared (Acts of 1897-8, pp. 353 and 445) that the wages and salaries of all municipal employees were subject to garnishment. Commenting on this change of public policy, Dr. Lile made this criticism: "The propriety of this legislation is questionable. A long established public policy of the common law is apt to be deeply rooted in wisdom, and should not be altered unadvisedly or lightly. This legislation overturns two important principles of public policy, which have received the sanction of the wisest jurists. One is that a municipal corporation should not be converted into a private agency for the collection of debts, or be forced into litigation in which it has no interest, with the result of consuming the time of its fiscal officers, incurring expense of counsel fees, the tying up of funds in its hands, and the complication of its accounts. See *Leake* v. *Lacy* (Ga.), 51 Am. St. Rep. 112, and the very valuable note appended. The other is, that it is against public interest that the salaries of public officials should be diverted to creditors. In contemplation of law, the official whom the public has designated for the performance of its service can best perform that service. If his salary may be intercepted by creditors, as each installment accrues, he cannot remain in office, and by his enforced resignation the public loses the benefit of his services and must be content with a less desirable, if more frugal, substitute." 4 Va. Law Reg. 849.

In a separate act (see Acts of 1899-1900, p. 546), this right of garnishment was extended to the wages and salaries of all employees of the State, as well as employees of municipalities. A minor amendment was made to the act in 1903 (Acts of 1902-3-4, p. 136).

In *Portsmouth Gas Co.* v. *Sanford*, 97 Va. 124, 127, 33 S. E. 516, 75 Am. St. Rep. 778, 45 L. R. A. 246, the facts were that a non-resident creditor of a contractor attached a fund due the contractor by the city of Portsmouth. The city defended on the ground that it was not liable to garnishment. It will be noted that the statute, changing the public policy of the State as to wages and salaries of State

and municipal employees, did not, in express terms, include any other obligation due by a city to a third party. Notwithstanding this fact, the city of Portsmouth was held liable to the garnishment. Judge Buchanan, speaking for the court, said: "If it be the policy of the State, as shown from this act, to make a municipal corporation liable to garnishment upon debts due its officials, there would seem to be no good reason for holding that it should not be liable to proceeding where it owes an ordinary debt to a third person, unless a contrary rule has been established in this State."

Prior to this decision, it had been held that it was against public policy to permit such garnishment, which ruling was based on the ground that it was against public policy to permit the money of the people and the time of officials to be expended in defending suits in which the city had no interest. Commenting on Judge Buchanan's opinion, *supra,* extending the right of garnishment to obligations other than the wages or salaries of employees, Judge Burks said: "Notwithstanding these facts, however, the decision in the principal case commends itself to our judgment as *plainly right.* Not because the current of decisions is wrong, but because the public policy of this State is different from that of the States holding a different view. The statute cited in the opinion in the principal case allowing the wages and salaries of officials, clerks, and employees of municipal corporations to be garnished, plainly indicates that the legislature regarded the payment of the debts of such clerks, officials, and employees more worthy of consideration than the slight pecuniary loss and inconvenience to municipal corporations in consequence of being garnished or attached. It plainly indicates the public policy of the State, and it can hardly be doubted that the legislature has the right, as well as the power, to establish the policy of the State in such matters. The court, in the principal case, has simply followed the public policy of this State, just as in a majority of the other States, their courts followed their public policy. The policies being different, the decisions were of necessity different, and yet

a like motive controlled the decision in each case." 5 Va. Law Reg. 176.

This continued to be the law in this State until the revision of the Code in 1919, when section 6559 was amended by eliminating the salaries of all State officers from liability to garnishment. Judge Burks, as one of the Code revisors, commenting upon this change made by the revisors, said: "The salaries of all State officials and employees, unless otherwise exempted, are now subject to garnishment. The revisors were of opinion that the state should not be garnished in any case, but knowing that the law had operated beneficially and effectively as to mere day laborers and employees of the state, enabling them to get credit when otherwise they could not have secured it, they struck out the provision concerning State officers and limited the section to employees. The places of mere employees can, in most instances, be more readily supplied than those of State officers, and if, for instance, the salaries of the Governor, Attorney-General and judges were entirely taken away by garnishment, the State might at some time be left impotent to discharge its functions." 5 Va. Law Reg. (N. S.) 138.

The execution creditor contends that the change in public policy, as expressed by Code of 1919, sections 6559, 6560 and 6561, is restricted to wages or salaries of State and municipal employees which have been earned, and does not apply to emoluments of office which have not been earned; and that, even if an assessor is not an employee of the municipality, he is an employee of the Commonwealth, and, as such, has no right to assign unearned compensation.

██ ██ A summons in garnishment creates no lien. It is a means of enforcing the lien of an execution placed in the hands of an officer to be levied. Such an execution or *fieri facias* is a lien "from the time it is delivered to a sheriff * * * to be executed, on all the personal estate of or to which the judgment debtor is, or may afterwards and on or before the return day of the said writ become, possessed or entitled * * * ." Code, sec. 6501. In other words, the statutes authorizing certain salaries, wages or compensation to be

garnisheed include not only the amount of such wages, salaries or other compensation due at the time the *fieri facias* is issued, but bind all of such unearned wages, salaries or compensation as may be earned between the date of the *fieri facias* and its return day.

It was the object of the legislature, in adopting the Code sections enumerated, to place the wages and salaries of municipal employees and all employees of the State, except State officials, on the same basis as the wages and salaries of employees of persons engaged in ordinary business enterprises. The unearned salary or wages of such employees can be assigned if, at the time of the assignment, the assignor be employed, although it may not be necessary that his employment be for any particular time. In other words, if the employee is under actual contract of employment, his future earnings amount to a possibility coupled with an interest, and are assignable.

The controversy in *Virginia Machinery, etc., Co.* v. *Hungerford Coal Co., post,* p. 550, opinion by Justice Spratley (announced at this session of the court), was between the assignee and an execution creditor of the assignor. We held that, as a general rule, rights arising under the contract may be assigned, and that such assignment may be established by oral testimony or acts and conduct of the parties.

Any debtor has a right to confess judgment in favor of his creditor. If a municipal or State employee were denied the right to assign the 'compensation of his office, earned or unearned, he could accomplish the same result by confessing judgment and permitting his creditor to cause an execution to be issued against him. Such procedure would incur needless expense of time, money and delay when the same end could be attained by a simple and direct assignment.

Plaintiff in error cites a number of authorities from other jurisdictions which are contrary to the conclusions stated. The public policy of this State is found in the Acts of the General Assembly and the opinions of this court. The statutes, permitting the wages or salary of certain classes of municipal and State employees to be garnisheed, indicate

that the legislature has rejected the reasons upon which the former public policy was based. These reasons were applicable to both the voluntary and the involuntary acts of the employee. To hold that the garnishment of unearned wages or salary *is not against* public policy and to hold that the voluntary assignment of such wages or salary *is against* public policy would be illogical and would affect adversely the credit of such employees. The reasons upon which such public policy was founded having been rejected, the public policy itself is thereby changed. If one class of employees has the right by voluntary act to dispose of earnings, there no longer exists any reason why the other class should not have the same right.

The judgment of the trial court is affirmed.

*Affirmed.*